IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

JOSÉ MOLINELLI-FREYTES, *et al.*,

    Plaintiffs,

    v.

UNIVERSITY OF PUERTO RICO, *et al.*,

    Defendants.

**Civil No. 09-1655 (DRD/BJM)**

## REPORT AND RECOMMENDATION

José Molinelli-Freytes ("Molinelli") and Lillian Bird-Canals ("Bird") (collectively, "plaintiffs") sued the University of Puerto Rico ("UPR"), the Puerto Rico Council on Higher Education ("CHE"), past and present UPR and CHE officers, the UPR trustees, and other allegedly responsible individuals, making claims of copyright infringement under the Copyright Act of 1976 ("the Copyright Act"), 17 U.S.C. §§ 101 *et seq.,* arising out of the use of a proposal for a degree program that Molinelli and Bird initially drafted.  Plaintiffs also made claims under 42 U.S.C. § 1983, the Puerto Rico Intellectual Property Act, 31 L.P.R.A. §§ 1401 *et seq.*, and for unjust enrichment, which have since been dismissed.  (See Docket Nos. 151, 294, 318).

Before the court are motions for summary judgment by three groups of defendants: (1) the members of the CHE,[1] as well as former Interim Executive Director David Baez (collectively, "CHE defendants") (Docket No. 336); (2) UPR President Miguel Muñoz, UPR Chancellor Ana Guadalupe, Faculty of Natural Sciences Dean Brad Weiner, and Environmental Sciences Program Director Rafael Ríos (collectively, "UPR defendants") (Docket No. 339); and (3) the members of the UPR

---

[1] The CHE movants are: Vivian Abreu, Jose Aparicio-Maldonado, Maximo Cerame-Vivas, Nilda Garcia-Santiago, Mercedes Gomez-Marrero, Jose Lema-Moya, Manuel Maldonado-Rivera, Elba Morales-Medina, Odette Pineiro-Caballero, Madeline Quiliquini-Paz, Edwin Quinones-Rivera, Eduardo J. Rivera-Medina, Jesus Rivera-Sanchez, and Edgar Sanchez-Rivera.

Board of Trustees[2] (collectively, "Trustee defendants") (Docket No. 341). Plaintiffs opposed the motions (Docket No. 362) and each set of defendants replied (Docket Nos. 387, 391, 394). Plaintiffs' opposition also requests declaratory relief as to copyright ownership, and a permanent injunction as to its already-dismissed claims under § 1983. (Docket No. 362). In addition, plaintiffs moved to "renew" their dismissed due process claims, and briefly suggest they are entitled to summary judgment on those claims. (Docket No. 359). The UPR defendants opposed this motion. (Docket Nos. 386, 396).

The summary judgment and related motions were referred to me for a report and recommendation. (Docket No. 343). For the reasons that follow, I recommend that plaintiffs' motion to "reinstall" their section 1983 claims be **denied**, that the defendants' motions for summary judgment be **granted**, that plaintiffs' requests for damages and equitable relief be **denied**, and that plaintiffs' copyright claims be **dismissed with prejudice**.

## FACTUAL AND PROCEDURAL BACKGROUND

The facts of the case are summarized here after applying Local Rule 56, which structures the presentation of proof at summary judgment.[3]

---

[2] The trustee movants are: Isabel Picó Vidal, Aida Ávalo, Agustín Cabrer, Norman Maldonado Simon, Marisara Pont Marchese, Marta Bustillo, Waldemiro Vélez, René Vargas, Luis M. Villaronga, Luis Berrios, Felipe Carro, Aníbal Jover Pagés, Ygrí Rivera de Martínez, Carlos J. Dávila Torres, Carlos Pérez Díaz, and Francisco Fantauzzi.

[3] The rule "relieve[s] the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute," CMI Capital Market Inv. v. González-Toro, 520 F.3d 58, 62 (1st Cir. 2008), and prevents parties from "shift[ing] the burden of organizing the evidence presented in a given case to the district court." Mariani-Colón v. Dep't of Homeland Sec., 511 F.3d 216, 219 (1st Cir. 2007). The penalty for noncompliance is severe: "If the party opposing summary judgment fails to comply with Local Rule 56(c), the rule permits the district court to treat the moving party's statement of facts as uncontested." Id. Thus, litigants ignore the rule "at their peril." Id.

A motion for summary judgment must be supported by "a separate, short, and concise statement of material facts, set forth in numbered paragraphs, as to which the moving party contends there is no genuine issue of material fact to be tried." Local Rule 56(b). The opposing party must admit, deny, or qualify the moving party's facts by reference to each numbered paragraph, and may make a separately numbered statement of material facts. Local Rule 56(c). The moving party may reply and admit, deny, or qualify the opponent's newly-stated facts, again in a separate statement and by reference to each numbered paragraph. Local Rule 56(d). Any facts supported by citation to record evidence and not properly controverted as described by the rule are deemed admitted. Local Rule 56(e).

**REPORT AND RECOMMENDATION**

### *Plaintiffs' Relationship with UPR*

Molinelli has been employed by UPR full-time since 1985.  (Docket No. 340, hereinafter "UPR St.," ¶ 1).  He teaches in the College of Natural Sciences, and has been paid a bi-weekly salary since 1984. (UPR St., ¶¶ 2–3).  Molinelli testified that his appointment letter was the only document detailing his employment agreement with UPR.  (Docket No. 363, hereinafter "Pl. 1st St.," ¶ 2).  UPR makes payroll withholdings from his salary, and provides him with medical insurance and other benefits. (UPR St., ¶¶ 4–5).  UPR provides him with an office, supplies, a computer, classrooms for teaching, and the services of an administrative assistant.  (UPR St., ¶ 6).  Molinelli and other professors have flexibility to perform work outside of regular business hours.  (UPR St., ¶ 7).  Between 1985 and 2006, Molinelli was also the Director of the Environmental Sciences Program. (UPR St., ¶ 8).  The Director position involves performing certain administrative duties.  (UPR St., ¶ 9).  Among others, this included checking contracts, recruiting personnel, making budget projections, supervising laboratory staff, ensuring the safety of physical facilities, purchasing equipment and supplies, and coordinating the Environmental Sciences undergraduate program on a day-to-day basis.  (Pl. 1st St., ¶¶ 6–7).  Because he held this position, UPR reduced Molinelli's academic workload requirement and paid him a bonus that began at $500 per month, and later increased.  (UPR St., ¶ 10).  Molinelli customarily teaches five to six more credits than required, and often teaches large classes.  (Pl. 1st St., ¶ 3).

Bird was a full-time UPR employee; in March 2010, she had been employed for 27 years. (UPR St., ¶ 11).  She teaches in the College of Natural Sciences.  (UPR St., ¶ 12).  Her workload includes teaching, research, and certain other work.  (UPR St., ¶ 13).  UPR provides her with a bi-weekly salary, an office, and supplies.  (UPR St., ¶¶ 14–15).

### *UPR's Organization, Duties, and Procedures*

UPR is divided into faculties, which are academic units grouping teaching personnel to teach related subjects.  (UPR St., ¶ 25).  In certain contexts, the term "faculty" under the UPR General Regulations also refers to the personnel within the academic unit.  (UPR St., ¶ 26).  The General

**José Molinelli-Freytes,** *et al.* **v. University of Puerto Rico,** *et al.*                    Page 4
Civil No. 09-1655 (DRD/BJM)
**REPORT AND RECOMMENDATION**

Regulations charge faculties with the duty to propose new academic programs.  (UPR St., ¶ 27).
Professors are also subject to the duties set forth in various UPR regulations.  (UPR St., ¶ 17).
Article 63, section 63.1.10 of the UPR General Regulations states that teaching personnel in general
have a responsibility to participate in planning the academic program of their departments or
faculties.  (UPR St., ¶ 18).  Academic planning includes designing new academic programs and
expanding the degrees offered by a department.  (UPR St., ¶¶ 19–20).  The UPR-Río Piedras
professor's manual directs professors to participate in the development and revision of curriculum.
(UPR St., ¶ 22).  The professor's manual is "informative in nature," however, and does not
specifically mention the phrase "creating and developing new academic programs."  (Pl. 1st St., ¶
20).  The duties of teaching-administrative personnel include direct participation in creating the
academic policy of faculties, campuses, and UPR as a whole.   (UPR St., ¶ 23).

        Certification 93-113 is a regulation governing the drafting and approval of proposals for new
academic programs within UPR, including prerequisites for CHE consideration and approval.  (UPR
St., ¶¶ 28–29).  Only institutions of higher education, and not individuals, can submit proposals to
the CHE for approval and ultimately implement them.  (UPR St., ¶ 30).  Within UPR, academic
proposals must be drafted by departments.  (UPR St., ¶ 31).  UPR department members write the
initial drafts of new proposals, which are then discussed within the department before they are
presented.  (UPR St., ¶ 32).

*The Proposal*

        Molinelli and Bird drafted a "Proposal for the Establishment of a Master's and Ph.D.
Program in Environmental Sciences at the Río Piedras Campus of the U.P.R.," following the
requirements of Certification 93-113.  (UPR St., ¶ 35).  When it was drafted, Molinelli was the only
member of the Environmental Sciences Program.  (Pl. 1st St., ¶ 5).  In 1995, Molinelli and Bird
began developing the idea of a graduate program in environmental sciences specializing in tropical
islands; they did not receive any express assignment or instruction from UPR to do so.  (Pl. 1st St.,
¶ 8).  They worked on a proposal for the program between 1995 and 2001.  (Pl. 1st St., ¶ 10).

Molinelli told Antonio García Padilla, then dean of the UPR law school, about their idea in 1995. (Pl. 1st St., ¶ 11).  Plans for a masters program are referenced in a January 1998 transition report from the Faculty of Natural Sciences.  (Docket No. 406-2, p. 3).  Weiner testified that he verbally assigned the task of creating a graduate degree proposal to Molinelli in 1999; however, Molinelli testified that Weiner never asked him to draft the proposal.  (Pl. 1st St., ¶¶ 13, 16).  Weiner did not give any specific terms or conditions for the assignment, and did not provide Molinelli with extra compensation or workload reduction to work on the proposal. (Pl. 1st St., ¶ 14).  On other occasions, Weiner had given Molinelli additional compensation for tasks he specifically commissioned.  (Pl. 1st St., ¶ 18).  A graduate student, who Weiner later hired to modify the proposal, was paid for the task.  (Pl. 1st St., ¶ 19).  Gladys Escalona de Motta testified that when an assignment is expected to cause a professor to exceed 37.5 hours of work per week, it is customary to grant release time for the project.  (Pl. 1st St., ¶ 20).  No written document tasks plaintiffs with the assignment of drafting the proposal, and no written document assigns copyright in the proposal to UPR or any of the defendants.  (Pl. 1st St., ¶¶ 21–22).  Molinelli testified that he used spare time, including vacations and holidays, to work on the proposal.  (Pl. 1st St., ¶ 16).  Molinelli and Bird conformed their draft to Certification 93-113 because they wanted to present the proposal to UPR.  (UPR St., ¶ 36).  The UPR Environmental Sciences Program is not a department, but is nevertheless subject to Certification 93-113.  (UPR St., ¶ 33).  The proposal is specific to the UPR Río Piedras campus. (UPR St., ¶ 37).

Bird and Molinelli presented the program to Weiner in 2001, in order to start the approval process.  (UPR St., ¶ 39; Pl. 1st St., ¶ 23).  The proposal describes itself as prepared by the Environmental Sciences program.  (UPR St., ¶ 38).  Within the College of Natural Sciences, professors and others reviewed the proposal, suggesting changes that the plaintiffs at least partially incorporated.  (UPR St., ¶ 40).  After it was approved by the College of Natural Sciences, this process occurred again at the Río Piedras Campus level.  (UPR St., ¶ 41).  Some of the participants in the review process included the campus-level Dean of Academic Affairs, and the Academic

Affairs Committee of the Río Piedras Campus Academic Senate. (UPR St., ¶ 42). Plaintiffs were aware of this process, and that reviewers could demand that certain changes be made as a condition of approval. (UPR St., ¶ 43–45). They participated in the process until only the University Board and Board of Trustees stages remained before submission to the CHE. (UPR St., ¶ 51). Sometime during the spring 2006 semester, Weiner met with some Department of Biology faculty members regarding the proposal. (Pl. 1st St., ¶ 28).

***The CHE and its Review of the Environmental Sciences Graduate Program***

The CHE was established as an entity separate from UPR by Law No. 17 of June 16, 1993, 18 L.P.R.A. §§ 852, *et seq.* (Docket No. 336-2, hereinafter "CHE St.," ¶ 3). During 2007, the UPR had not submitted any application for a license amendment related to the proposal. (CHE St., ¶ 11). No CHE member or employee was either aware of the plaintiffs' drafting of the proposal or part of the UPR Natural Sciences faculty between 2000 and 2007. (CHE St., ¶¶ 12–13). The CHE promulgated new regulations on November 5, 2008, which ultimately became effective on March 16, 2009. (CHE St., ¶¶ 16–17). On December 22, 2008, UPR informed CHE of its intent to request an amendment of its license to offer masters and doctorate programs in Environmental Sciences. (CHE St., ¶ 18). The UPR Board of Trustees approved the creation of these programs on March 11, 2009, and UPR submitted a request for license amendment on March 13, 2009. (CHE St., ¶¶ 19–20). No CHE member participated in UPR's internal approval process for the proposal. (CHE St., ¶ 22). UPR's submission did not provide the names of individuals who prepared the proposal. (CHE St., ¶ 23). The CHE approved the masters program on May 20, 2009, and published a certification on June 10, 2009. (CHE St., ¶ 28). The certification authorized the masters proposal, but approval of the doctoral program was withheld pending further evaluation. (CHE St., ¶ 29). UPR obtained a research grant to implement the program. (UPR St., ¶ 81). The program was implemented in August 2009, and there are both students and professors involved in it. (UPR St., ¶ 84).

On July 13, 2009, the plaintiffs requested a copy of the proposal in person at the CHE offices; CHE's Acting Director for the Division of Licensing and Accreditation, Aida Freytes, provided them

with a copy of the certification, but did not turn over CHE's file.  (CHE St., ¶ 30).  The plaintiffs

wrote CHE on March 4, 2010 requesting a meeting with the Advisory Board reviewing the proposal.

(CHE St., ¶ 33).  The CHE replied on March 9, 2010 with an invitation to attend a meeting on March

11, 2010.  (CHE St., ¶ 34).  At the meeting, the plaintiffs told the Advisory Board members that they

would not be included in the federal lawsuit.  (CHE St., ¶ 35).  They presented the board members

with a letter describing the suit against UPR and asking to engage in further discussion about the

contents of the proposal.  (CHE St, ¶ 35).  The letter included an attachment comparing the UPR

submission to their draft proposal.  (CHE St., ¶ 36).  The plaintiffs discussed this letter and its

attachment with the Advisory Board.  (CHE St., ¶ 37).  The CHE notified UPR of its findings

regarding the proposal on June 29, 2010.  (CHE St., ¶ 39).

On January 31, 2011, CHE approved license amendments for UPR to offer masters and Ph.D.

programs in Environmental Sciences.  (Pl. 1st St., ¶ 45).  A compliance report was due August 1,

2011.  (Pl. 1st St., ¶ 46).

### *Plaintiffs' Copyright Registration, Demand Letter, and Administrative Proceedings*

On June 29, 2007, plaintiffs obtained a Copyright Office registration.  (Pl. 1st St., ¶ 32).

They also registered with the Puerto Rico Intellectual Property Registrar.  (Pl. 1st St., ¶ 33). On July

5, 2007, plaintiffs sent a demand letter to the UPR chancellor claiming they held the proposal's

copyright and demanding that UPR stop using or following the proposal.  (UPR St., ¶ 46).  The CHE

Office of Licensing and Accreditation was also sent a copy of the letter.  (Pl. 1st St., ¶ 40).  Escalona

de Motta testified at the preliminary injunction hearing that she had never seen a claim of that type

before.  (UPR St., ¶ 48).  Bird testified that she had never heard of a similar claim either.  (UPR St.,

¶ 49).  The proposal did not include a claim of authorship or notice of copyright.  (UPR St., ¶ 50).

Plaintiffs testified in depositions that they had not attempted to market the proposal to others, nor

had they received offers for it.  (UPR St., ¶ 79).

Escalona de Motta replied on August 23, 2007 rejecting their claims, but offered to discuss

the matter with them.  (UPR St., ¶¶ 53–54).  This determination was made without a hearing, did not

contain findings of fact, and was based on an expert opinion.  (Docket No. 364,[4] hereinafter "Pl. 2d St.," ¶ 6).  Plaintiffs never responded to this offer.  (UPR St., ¶ 55).  On September 7, 2007, plaintiffs wrote to Antonio García Padilla, then the UPR President, requesting his intervention in the matter, and copied the CHE Office of Licensing and Accreditation.  (UPR St., ¶ 56; CHE St., ¶ 6).  Plaintiffs wrote to the UPR Board of Trustees, with copies to the CHE, on October 17 and December 19, 2007.  (CHE St., ¶¶ 7–8).

Meanwhile, plaintiffs started administrative proceeding 90-193 in the Office of the President regarding their copyright claims.  (UPR St., ¶ 57).  The Office referred the claims to Examining Officer Angel Rossy García on April 8, 2008.  (UPR St., ¶ 58; Pl. 2d St., ¶ 11).  The hearing officer was paid by UPR on a part-time basis.  (Pl. 2d St., ¶ 12).  The plaintiffs were represented by an attorney, and were told they had a right to representation, to submit evidence, to subpoena witnesses, and to cross-examine witnesses.  (UPR St., ¶¶ 59–60).  UPR answered on July 9, 2008, claiming work for hire and estoppel defenses.  (UPR St., ¶ 61).  The parties made stipulations at an initial conference on September 5, 2008, and the hearing officer directed the parties to focus on the work for hire defense.  (UPR St., ¶¶ 62–63).  The parties conducted discovery, including document production and the taking of a deposition.  (UPR St., ¶ 64).  UPR moved for summary judgment on the work for hire question, which plaintiffs opposed.  (UPR St., ¶¶ 65–66).  The hearing officer issued a report on February 26, 2010 finding that the proposal was a work for hire, and recommending dismissal of the plaintiffs' claims.  (UPR St., ¶ 69).  The CHE was not aware of the ongoing UPR administrative proceedings.  (CHE St., ¶ 15).

The Office of the President adopted the hearing officer's report in its entirety on March 9, 2010, and dismissed plaintiffs' claims.  (UPR St., ¶¶ 70–71; Pl. 2d St., ¶ 24).  Plaintiffs appealed to the Board of Trustees on April 13, 2010.  (UPR St., ¶ 74).  On July 1, 2010, the Board dismissed plaintiffs' appeal as untimely, and found that this deprived it of jurisdiction.  (UPR St., ¶ 75; Pl. 2d

---

[4] As the UPR defendants observe, this additional statement of facts does not conform to Local Rule 56 as it does not contain specific record citations.  Nevertheless, the UPR defendants admit specific portions of the statement; I therefore consider those portions uncontested for summary judgment purposes.

St., ¶ 33). The Board also recognized that the Office of the President had not ruled on plaintiffs' March 24, 2010 motion for relief from the judgment. (Pl. 2d St., ¶ 33). The Puerto Rico Court of Appeals affirmed this decision on November 16, 2010, and denied plaintiffs' subsequent request for reconsideration. (UPR St., ¶¶ 77–78; Pl. 2d St., ¶ 37). On September 12, 2011, the Office of the President denied plaintiffs' motion for relief from its judgment. (Pl. 2d St., ¶¶ 42, 57). On October 18, 2011, the Board of Trustees ordered the Office of the President to file a position brief in the appeals process. (Pl. 2d St., ¶ 61).

## PLAINTIFFS' MOTION REGARDING DUE PROCESS CLAIMS

Plaintiffs move to "renew" or "reinstall" their previously-dismissed procedural due process claims regarding the UPR administrative proceeding, and intimate that they are entitled to summary judgment on them. (Docket No. 359). They assert that they have offered "abundant evidence of bias and specific examples of procedural irregularities" violative of due process, and that "[s]uch evidence warrants the reinstallation of the new 1983 claims dismissed without prejudice." (Id., ¶¶ 7–8). They do not identify the procedural vehicle for this motion, but in substance they must confront the court's prior ruling that *Younger* abstention required dismissal of these claims. (See Docket No. 294). Therefore, as the defendants suggest, I will evaluate this request as a motion for reconsideration of the dismissal. This court previously articulated the standard by which it would evaluate motions for reconsideration:

> Motions for reconsideration are generally considered either under Rules 59 or 60 of the Federal Rules of Civil Procedure, depending on the time when such motion is served. *See* Perez-Perez v. Popular Leasing Rental, Inc., 993 F.3d 281, 284 (1st Cir. 1993).

> It is further accepted that "[a] motion for reconsideration does not provide a vehicle for a party to undo its own procedural failures and it certainly does not allow a party to introduce new evidence or advance new arguments that could or should have been presented to the district court prior to judgment." Marks 2-Zet-Ernst Marks GMBH & Co. KG v. Presstek, Inc., 455 F.3d 7, 15-16 (1st Cir. 2006). Thus, a motion for reconsideration cannot be used as a vehicle to re-litigate matters already litigated and decided by the Court. *See* Standard Quimica de Venezuela v. Central Hispano Int'l, Inc., 189 F.R.D. 202 n. 4 (D.P.R. 1999). These motions are entertained by courts if they seek to correct manifest errors of law, present newly discovered evidence, or when there is an intervening change in law. *See* Prescott v. Higgins, 538 F. 3d 32, 45 (1st Cir. 2008); *see also* Rivera Surillo & Co. v. Falconer

Glass Indus., Inc., 37 F.3d 25, 29 (1st Cir. 1994) (citing F.D.I.C. Ins. Co. v. World University, Inc., 978 F.2d 10, 16 (1st Cir. 1992). A motion for reconsideration is unavailable if said request simply brings a point of disagreement between the court and the litigant, or reargues matters already properly disposed of by the Court. *See e.g.* Waye v. First Citizen's National Bank, 846 F. Supp. 310, 314 n.3 (M.D.Pa. 1994).

(Docket No. 294, p. 10–11).

Here, the statement of facts attached to plaintiffs' motion alleges new occurrences since the date of the last amended complaint, which at first glance could warrant revisiting the court's earlier findings. (See Docket No. 359-1, ¶¶ 37–61). But none of the new facts, though taken as true for this motion, address the court's finding that the availability of interlocutory review in Puerto Rico courts precludes application of the *Gibson* exception to *Younger* abstention. (See Docket No. 294, p. 19) (citing Esso Std. Oil Co. v. Cotto (*Esso I*), 389 F.3d 212, 222 (1st Cir. 2004)). Puerto Rico law permits interlocutory review of administrative proceedings in cases involving a lack of jurisdiction, questions of pure law, and "grave constitutional grievances." *Esso I*, 389 F.3d at 223–24 (citing Oficina de la Procuradora del Paciente v. Aseguradora MCS, 163 D.P.R. 21 (2004)). This avenue "obviates the need for federal intervention in this case pursuant to the *Gibson* exception to *Younger* abstention." Id. at 224–25. And plaintiffs have not presented any evidence—or even alleged—that the Puerto Rico courts will not entertain an interlocutory appeal alleging due process violations. Cf. Esso Std. Oil Co. v. Lopez-Freytes (*Esso II*), 522 F.3d 136, 143–44 (1st Cir. 2008) (plaintiff only overcame *Younger* abstention after Puerto Rico courts declined to review the merits). Finally, plaintiffs point out that federal courts have exclusive jurisdiction over actions for copyright infringement. This does not address the relevant question, however, of whether a Puerto Rico court can provide them with relief for their due process violations.

In sum, notwithstanding plaintiffs' new evidence, there is no factual basis for revisiting the court's decision to abstain on *Younger* grounds. Plaintiffs' motion to reinstate the claims should therefore be denied, and since the claims remain dismissed, their request for summary judgment is irrelevant.

**José Molinelli-Freytes,** *et al.* **v. University of Puerto Rico,** *et al.*                                            Page 11
Civil No. 09-1655 (DRD/BJM)
**REPORT AND RECOMMENDATION**

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material only if it "might affect the outcome of the suit under the governing law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and "[a] 'genuine' issue is one that could be resolved in favor of either party." Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004). The court does not weigh the facts, but instead ascertains whether the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Leary v. Dalton, 58 F.3d 748, 751 (1st Cir. 1995).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [evidence] . . . which it believes demonstrate the absence of a genuine issue of material fact." Crawford-El v. Britton, 523 U.S. 574, 600 n.22 (1998) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)); Fed. R. Civ. P. 56(c)(1). Once this threshold is met, the burden shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). However, the court draws inferences and evaluates facts "in the light most favorable to the nonmoving party," Leary, 58 F.3d at 751, and an evaluating court may not "superimpose [its] own ideas of probability and likelihood (no matter how reasonable those ideas may be) upon the facts of the record." Greenburg v. P.R. Maritime Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987).

Nonetheless, summary judgment is appropriate where the nonmoving party rests entirely upon "conclusory allegations, improbable inferences, and unsupported speculation" on any essential element of the claim. Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

## DISCUSSION

The defendants' arguments in support of summary judgment address five questions: (1) whether claims against the CHE defendants are moot; (2) whether claims against the CHE

defendants are estopped, waived, or released; (3) whether the CHE or Trustee defendants engaged in copying; (4) whether claim or issue preclusion bars the copyright action as to UPR and Trustee defendants; and (5) whether UPR holds the proposal's copyright as a work for hire.  Following my consideration of these issues, I turn to plaintiffs' requests for damages, declaratory relief, and injunctive relief.

## I.        Mootness of Claims Against CHE Defendants

The CHE defendants allege that procedural developments in the case have mooted plaintiffs' case against them, and that the court therefore lacks jurisdiction over the claims.  (Docket No. 336-1, p. 23–25).  Mootness doctrine stems from the Article III requirement that federal courts only decide cases or controversies, and requires dismissal where "the issues presented are no longer live or when the parties lack a legally cognizable interest in the outcome."  Chico Serv. Sta., Inc. v. Sol P.R. Ltd., 633 F.3d 20, 35 (1st Cir. 2011) (quoting Cruz v. Farquharson, 252 F.3d 530, 533 (1st Cir. 2001)).  But a case is not moot unless "an intervening event makes it impossible for the court to grant any effectual relief."  Weaver's Cove Energy, LLC v. R.I. Coastal Resources Mgmt. Council, 589 F.3d 458, 468 (1st Cir. 2009) (citations and quotation marks omitted).

The CHE defendants first point to the court's expression in a status conference that it would not enjoin implementation of the graduate program.  (See Docket No. 319, p. 2) ("The Court stated that Plaintiffs would not receive equitable relief and that the Court will not order an injunction stopping the implementation of the graduate program.").  However, since judgment has not entered, this position could still potentially, however unlikely, be subject to reconsideration, and does not render the case moot.  Second, they assert that the plaintiffs' narrowing of issues in their jury demand and ISC memoranda leave no factual dispute regarding the CHE defendants' conduct.  (Docket No. 336-1, p. 24).  However, this does not resolve whether any relief could be fashioned against them, which is an issue that has not yet been adjudicated; therefore, the issue remains live.  Third, the CHE defendants reference their waiver argument, which has also not been decided yet.  Therefore, unless

and until any of these issues are resolved in their favor, the court could still order relief against them.

Because the case is not moot, I go on to the defendants' substantive arguments.

## II.      Estoppel, Waiver, and Release of CHE Defendants

The CHE defendants posit that even assuming any of their actions were infringing, the CHE's actions were justified by plaintiffs' participation in their deliberative process and representation that the CHE would not be sued.  I briefly consider whether they are entitled to judgment on these facts as estoppel,  waiver, or release, keeping in mind that a movant cannot obtain summary judgment on an affirmative defense "unless the evidence he provides on that issue is conclusive."  See Torres Vargas v. Santiago Cummings, 149 F.3d 29, 35 (1st Cir. 1998).

Copyright law recognizes equitable defenses to infringement, including estoppel and waiver. John G. Danielson, Inc. v. Winchester-Conant Props., Inc., 322 F.3d 26, 43–44 (1st Cir. 2003).  To establish equitable estoppel, "(1) the party to be estopped must know the facts; (2) that party must intend that his conduct be acted upon (or must act in a way that leads the party asserting the estoppel to believe it is so intended); (3) the latter must be ignorant of the true facts; and (4) he must rely on the estopping conduct to his detriment."  Plumley v. S. Container, Inc., 303 F.3d 364, 374 (1st Cir. 2002).  Waiver or release of a right must generally be both knowing and voluntary.  See id. (citing Medical Air Tech. Corp. v. Marwan Inv., Inc., 303 F.3d 11, 19 (1st Cir. 2002)) (waiver of right to jury trial); see also Caban Hernandez v. Philip Morris USA, Inc., 486 F.3d 1, 8–9 (1st Cir. 2007) (waiver by release of Title VII claims must be knowing and voluntary).  Relevant factors in this inquiry include "the waiving party's education and business experience, the respective roles of the parties in determining the terms of the waiver, the clarity of the agreement, the amount of time the waiving party had to consider the waiver, whether the waiving party was represented by counsel, and the consideration offered for the waiver . . . ."  Medical Air Tech., 303 F.3d at 19 n. 4.

Here, the only evidence in support of any of these defenses is Blanca Rivera's statement that plaintiffs participated in a CHE meeting, and told the CHE Advisory Board that they did not intend to sue the CHE. (Docket No. 336-9, ¶ 11).  However, the statement is inadequate to support any of

José Molinelli-Freytes, *et al.* v. University of Puerto Rico, *et al.*                                    Page 14
Civil No. 09-1655 (DRD/BJM)
**REPORT AND RECOMMENDATION**

the cited theories.  There is no evidence of CHE's reliance on plaintiffs' statement, precluding a finding of estoppel.  Additionally, Rivera stated that the plaintiffs informed the CHE of their copyright claims against UPR, undermining the ignorance element.  And finally, the evidence does not address any of the factors that must be considered to determine whether there was a knowing and voluntary waiver or release.  In short, this evidence is not a sufficient ground for granting summary judgment on these affirmative defenses.

## III.    Infringement Liability of Trustee and CHE Defendants and Injunctive Relief

The Trustee and CHE defendants argue that the plaintiffs have failed to show evidence of infringement liability to survive summary judgment, and therefore, are not entitled to injunctive relief against any of them.[5]  The court has already denied plaintiffs' request for a temporary injunction following an evidentiary hearing.  (Docket No. 182).  Thus, I consider whether final injunctive relief against the Trustee and CHE defendants is available.

The Copyright Act authorizes courts to grant "temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright."  17 U.S.C. § 502(a).  To be entitled to a final injunction, a plaintiff must generally show (1) past infringement and (2) a likelihood of continuing infringement.  Bridgeport Music, Inc. v. Justin Combs Publ'g, 507 F.3d 470, 492 (6th Cir. 2007), *cert. denied*, 555 U.S. 818 (2008); Pac. & S. Co. v. Duncan, 744 F.2d 1490, 1499 (11th Cir. 1984), *cert. denied*, 471 U.S. 1004 (1985); Pedrosillo Music, Inc. v. Radio Musical, Inc., 815 F. Supp.  511, 516 (D.P.R. 1993); 4-14 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 14.06 (Lexis 2011).

To show infringement, a plaintiff must show that he owned a copyright and that the defendant copied "constituent elements of the work that are original."  Airframe Sys., Inc. v. L-3 Comms.

---

[5] As the CHE and Trustee defendants note, this court already dismissed claims against them for official-capacity damages because of sovereign immunity.  (Docket Nos. 151, 294).  Claims against them in personal capacities have also been dismissed.  (Docket Nos. 294, 318).  The only remaining claims against them are for injunctive relief in their official capacities.  For this reason, CHE defendants' discussion of qualified immunity (Docket No. 336-1, p. 13–21) is inapposite; the doctrine protects them only from liability for civil damages, see Lopera v. Town of Coventry, 640 F.3d 388, 396 (1st Cir. 2011), and the damages claims were already dismissed.

Corp., 658 F.3d 100, 105–106 (1st Cir. 2011).  Copying is proven by showing "(a) that the defendant actually copied the work as a factual matter," and "(b) that the defendant's copying of the copyrighted material was so extensive that it rendered the infringing and copyrighted works 'substantially similar.'"  Id. (quoting Situation Mgmt. Sys., Inc. v. ASP Consulting LLC, 560 F.3d 53, 58 (1st Cir. 2009)) (further citations omitted).  Absent direct evidence, actual copying may be inferred where the later work is "probatively" similar to the original.  See Mag Jewelry Co., Inc. v. Cherokee, Inc., 496 F.3d 108, 114–15 (1st Cir. 2007); T-Peg, Inc. v. Vt. Timber Works, Inc., 459 F.3d 97, 111–112 (1st Cir. 2006).  Substantial similarity exists where "a reasonable, ordinary observer, upon examination of the two works, would 'conclude that the defendant unlawfully appropriated the plaintiff's protectable expression.'"  T-Peg, 459 F.3d at 112 (quoting Johnson v. Gordon, 409 F.3d 12, 18 (1st Cir. 2005)).

        The plaintiffs assert that the defendants (though it is unclear which) "admit that they used, adapted, translated, and prepared unauthorized derivative versions of the Original Manuscript," and that they therefore need not offer further proof of the copying element.  (Docket No. 362, p. 33).  But the plaintiffs do not pinpoint these supposed admissions in either their statements of fact or in their briefing, and thus have failed to provide the "raw materials" necessary for the court to evaluate their position.  See Velásquez Rodríguez v. Municipality of San Juan, 659 F.3d 168, 175 (1st Cir. 2011); see also Local Rule 56(e) ("The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts.").  Nevertheless, their summary judgment evidence included a certification by the Board of Trustees, which outlined curriculum sequences for masters and doctoral programs in environmental sciences.  (Docket No. 363-17, p. 2–4).  They also submitted their original manuscript, which includes curriculum sequences for masters and doctoral programs.  (Docket No. 363-6, p. 23–25).  Comparing the two, an ordinary observer could find enough similarities between the course titles and organization to reasonably conclude there was both copying in fact and substantial similarity.  Thus, as to the UPR

**José Molinelli-Freytes**, *et al.* **v. University of Puerto Rico**, *et al.*                                                          Page 16
Civil No. 09-1655 (DRD/BJM)
**REPORT AND RECOMMENDATION**

Board of Trustees only, plaintiffs have provided enough evidence to survive summary judgment on the copying question.[6]

On the other hand, I cannot readily locate any evidence in plaintiffs' summary judgment submission to support a finding of infringement by the CHE defendants. There is no evidence of any infringing work created by the CHE that could have copied plaintiffs' proposal, and plaintiffs do not highlight any testimony from which to infer this. Cf. Airframe Sys., 658 F.3d at 106–08 (affirming summary judgment where plaintiff failed to offer evidence of the original work). Even the allegations in plaintiffs' complaint suggest that they have no infringement theory against CHE and its members, but rather that they were "made part of this claim so that this Honorable Court may issue an injunction . . . ordering the current members of the Council to stay the process of approval until the claims herein are solved." (Docket No. 222, ¶ 4.8). Of course, the preliminary injunction has already been denied (Docket No. 182), and absent a showing of past infringement and a likelihood of continuing infringement, there is no basis for a final injunction under the Copyright Act. See, e.g., Bridgeport, 507 F.3d at 492. And though plaintiffs make passing reference to secondary or contributing infringers, they neither state the relevant legal principles nor apply them to the present facts. This "is hardly a serious treatment of complex issues," waiving further consideration. See Velásquez Rodríguez, 659 F.3d at 176 (brackets and quotation marks omitted). Therefore, the CHE defendants are entitled to summary judgment.

**IV.     Whether Preclusion Bars Litigation of the Copyright Claims**

The UPR defendants argue[7] that the administrative proceeding before the Office of the President has preclusive effect here under both claim and issue preclusion doctrines. The defendant to an action has the burden of establishing *res judicata*. Dillon v. Select Portfolio Servicing, 630

---

[6] The better analysis may be to impute the acts of campus-level UPR employees to the Board of Trustees as ultimately responsible officers. However, plaintiffs do not suggest this, so I consider it no further.

[7] The Trustee defendants incorporate the UPR defendants' arguments by reference in their own motion. (Docket No. 341, p. 1–2). For clarity, I only refer to the UPR defendants' motion.

**José Molinelli-Freytes**, *et al.* **v. University of Puerto Rico**, *et al.*                    Page 17
Civil No. 09-1655 (DRD/BJM)
**REPORT AND RECOMMENDATION**

F.3d 75, 80 (1st Cir. 2011); Rogondino v. Paolillo, — F. Supp. 2d —, 2011 WL 2199352 (D.P.R.

June 6, 2011). Puerto Rico law determines the preclusive effect of a Commonwealth court's

judgment. Barreto-Rosa v. Varona-Mendez, 470 F.3d 42, 45 (1st Cir. 2006). Puerto Rico's *res*

*judicata* doctrine encompasses both claim preclusion and issue preclusion. Cruz-Berríos v.

González-Rosario, 630 F.3d 7, 12 (1st Cir. 2010). To have preclusive effect, a prior judgment must

be "final and unappealable." Barreto-Rosa, 470 F.3d at 45. There must be "the most perfect identity

between the things, causes, and persons of the litigants, and their capacity as such." 31 L.P.R.A. §

3343. The identity of parties requirement is satisfied where there is privity between the past and

present litigants. R.G. Financial Corp. v. Vergara-Nunez, 446 F.3d 178, 185 (1st Cir. 2006).

Here, the UPR defendants argue that the UPR administrative decision bars plaintiffs from

relitigating their copyright claims at all, and the question of "work for hire" specifically. However,

the uncontested facts do not resolve whether there is sufficient privity among each of the defendants

and UPR, so a finding that UPR would be entitled to judgment on preclusion grounds would not

necessarily dispose of the case. Therefore, I proceed directly to the question of whether the

proposal's copyright was owned by the plaintiffs, or whether it was a work for hire for UPR.

**V.      Copyright Infringement and the Work For Hire Doctrine**

The UPR defendants argue that they are entitled to summary judgment because UPR holds

the proposal's copyright as a work for hire. Plaintiffs argue that the UPR policy on intellectual

property vests the proposal's copyright in themselves, and that in any case the proposal was not a

work for hire. I begin by reviewing the elements and burdens of proof in an infringement action,

consider the applicability of the work for hire doctrine, and review the effect of UPR's intellectual

property policy. Finally, I consider plaintiffs' argument that the UPR defendants lack standing to

challenge ownership of the copyright in the first place.

**A.      Elements of Copyright Infringement and Burdens of Proof**

To hold a defendant liable for copyright infringement, a plaintiff must show that (1) she has

properly registered a copyright, (2) that she owns a valid copyright, and (3) that the defendant copied

**José Molinelli-Freytes,** *et al.* **v. University of Puerto Rico,** *et al.*                    Page 18
Civil No. 09-1655 (DRD/BJM)
**REPORT AND RECOMMENDATION**

"constituent elements of the work that are original." Airframe Sys., 658 F.3d at 105–106 (quoting Situation Mgmt., 560 F.3d at 58). A plaintiff bears the burden of proof on these elements. Id. A certificate of copyright made within five years of publication is prima facie evidence of a valid copyright, and its proffer shifts the burden to the defendant to "demonstrate some infirmity" in the plaintiff's claim. Johnson v. Gordon, 409 F.3d 12, 17 (1st Cir. 2005); 17 U.S.C. § 410(c). However, courts may exercise discretion to give less weight, or none at all, to later-made certificates. Brown v. Latin Am. Music Co., 498 F.3d 18, 23–24 (1st Cir. 2007).

Though plaintiffs submitted a certificate of registration for the proposal, the certificate states that the proposal was first published in 2001, while the certificate was effective June 29, 2007. (See Docket No. 363-12). Because the certificate was made more than five years after the stated date of publication, it is not prima facie evidence under § 401(c). The only time plaintiffs discuss a prima facie presumption is in connection with their "standing" argument, which I reach later; however, they do not discuss the certificate or argue that it should be given any special evidentiary weight in spite of its age. Because the plaintiffs do not develop any reason why the certificate should be especially probative of ownership, and given the extensive analysis by both sides of the ownership question itself, I will not give the certificate any burden-shifting effect. Therefore, plaintiffs retain their original burden of establishing ownership. With that in mind, I turn to the defendants' principal challenge.

**B.      Ownership of a Work For Hire**

The UPR defendants argue that the proposal was a work for hire, and that UPR, not plaintiffs, therefore holds the copyright in the proposal. While a copyright usually "vests initially in the author or authors of the work," the copyright in "works made for hire" instead belongs to the person for whom the work was prepared. Saenger Org., Inc. v. Nationwide Ins. Lic. Assoc., Inc., 119 F.3d 55, 59 (1st Cir. 1997); 17 U.S.C. § 201(a). Importantly, only an express written agreement signed by the parties may alter the vesting of copyright in a work made for hire. Saenger, 119 F.3d at 63; 17 U.S.C. § 201(b). "To determine whether a work is [made] for hire under the Act, a court first should

ascertain, using principles of [the] general common law of agency, whether the work was prepared by an employee or an independent contractor. After making this determination, the court can apply the appropriate subsection of § 101." Saenger, 119 F.3d at 60 (quoting Community for Creative Non-Violence v. Reid, 490 U.S. 730, 750–51 (1989)) (alterations in original).

In the case of an employee, a work is made for hire if it was prepared within the scope of employment. 17 U.S.C. § 101. The scope of employment is determined under common law agency principles, summarized in the Restatement (Second) of Agency § 228. *Exception Ruling*, 792 F. Supp. 2d 164, 170 n. 8 (D.P.R. 2010).[8] To fall within the scope of employment, an employee's conduct must (1) be "of the kind [the employee] is employed to perform"; (2) occur "substantially within authorized time and space limits"; and (3) be "actuated, at least in part, by a purpose to serve the master." See Restatement (Second) of Agency § 228.

Here, the plaintiffs concede that they were UPR employees as contemplated by Reid. (Docket No. 362, p. 13–14). The gateway issue, then, is whether drafting the proposal was within the scope of Molinelli and Bird's employment. All three Restatement elements are met here. It is uncontested that Bird and Molinelli were employed by UPR to teach full-time in the College of Natural Sciences, and that Molinelli was also Director of the Environmental Sciences Program. (UPR St., ¶¶ 2–3, 8, 12). The UPR defendants highlight UPR regulations describing the responsibility of teaching personnel to participate in planning the academic program of their departments or faculties. (UPR St., ¶ 18). Going one step further, they also point to evidence that the term is meant to include the expansion of programs and degrees offered in a department. (UPR

---

[8] The UPR defendants note that a third Restatement of Agency has been published since *Reid* was decided, and suggest using its arguably broader definition of the scope of employment. (Docket No. 339, p. 18 n. 14). I do not rely on the newer test because this court applied the second Restatement at the preliminary injunction stage. See Molinelli-Freytes v. Univ. of P.R. (*Injunction Ruling*), 792 F. Supp. 2d 150, 159 (D.P.R. 2010). Moreover, many courts analyzing copyright claims continue using the second Restatement to analyze work for hire questions. See, e.g., JustMed, Inc. v. Byce, 600 F.3d 1118, 1125–27 (9th Cir. 2010); 721 Bourbon, Inc. v. B.E.A., Inc., Civ. No. 11-710, 2011 WL 3747231, at **10–11 (E.D. La. Aug. 25, 2011); Fleurimond v. N.Y. Univ., 722 F. Supp. 2d 352, 356 (E.D.N.Y. 2010); TAP Worldwide, LLC v. Becker, No. CV 10-04903 DMG (JCx), 2010 WL 2757354, at **2–3 (C.D. Cal. July 12, 2010); Blueport Co., LLP v. United States, 76 Fed. Cl. 702, 725–26 (2007); Rouse v. Walter & Assoc., LLC, 513 F. Supp. 2d 1041, 1056 (S.D. Iowa 2007).

**José Molinelli-Freytes**, *et al.* **v. University of Puerto Rico**, *et al.*                    Page 20
Civil No. 09-1655 (DRD/BJM)
**REPORT AND RECOMMENDATION**

St., ¶¶ 19–20).  The plaintiffs point to testimony that another document, the "Professor's Manual,"

is "informative in nature" and does not contain the phrase "creating and developing new academic

programs."  (Docket No. 362, p. 19; Pl. 1st St., ¶ 20).  But in light of the other terms in the general

regulations, this absence does not support an inference that creating new degrees was *not* part of the

work professors were expected to perform.  Plaintiffs further argue that because (1) UPR customarily

granted release time for special projects and (2) they received no such release time, then drafting the

proposal was not the kind of work they were employed to perform.  (See Docket No. 362, p. 19).

However, the only direct implication of these facts is simply that UPR did not consider the drafting

to be such a special project.  Moreover, the fact that UPR customarily granted extra compensation

for special projects is not probative of whether such projects were different in *kind* from what

Molinelli was employed to perform.  There is simply no evidence from which a jury could conclude

that creating degree programs was not the kind of work Bird and Molinelli were employed to

perform.

       For the second element, the UPR defendants highlight that Molinelli and other professors are

given the flexibility to work outside of regular business hours.  (UPR St., ¶ 7).  Plaintiffs point to no

evidence from which a jury could conclude that UPR did not authorize them to work from home or

on weekends or holidays.  And contrary to plaintiffs' unprofessional and offensive comment (Docket

No. 362, p. 19, final sentence), this analysis does not result in a rule that all academic work created

while employed by UPR is necessarily within the scope of employment, since the other Restatement

elements must still be present.

       Plaintiffs dispute the third element by pointing to Molinelli's testimony regarding his

background in environmental issues, and that he and Bird decided to design a graduate program

independently of instruction or guidance from UPR.[9]  (Docket No. 362, p. 20).  Yet even in the light

_____

       [9] They further assert that they were "motivated by the critical environmental situation of this island and the
independent public battles fought by Molinelli without the UPR's involvement."  (Docket No. 362, p. 20).  However,
the cited statement of fact (Pl. 1st St., ¶ 9) is not supported by the cited testimony from the injunction hearing.  While
Molinelli testified about his background in environmental advocacy and research, this testimony does not establish or

most favorable to plaintiffs, this testimony does not support an inference that either Molinelli or Bird *lacked* an intent to further UPR's interests. The UPR defendants, on the other hand, highlight uncontested evidence showing that the proposal specifically targets UPR-Río Piedras, that the plaintiffs designed it with the intent of submitting it to the UPR and CHE approval process, and that they actually did so. (Docket No. 339, p. 25–26). "It is the state of the servant's mind which is material. . . . However, it is only from the manifestations of the servant and the circumstances that, ordinarily, his intent can be determined." Restatement (Second) of Agency § 235, cmt. a. Because there is uncontroverted evidence of intent to advance UPR's interests, defendants have shown that there is no material dispute over the facts supporting their legal conclusion.

In sum, the UPR defendants have submitted evidence showing that the proposal was within the scope of the plaintiffs' employment, and therefore that the work for hire doctrine should apply to vest copyright in UPR. Plaintiffs have not established a genuine issue of material fact as to any element of the work for hire rule. I next consider whether the UPR Intellectual Property Policy modifies the rule.

### C. Effect of the Institutional Policy Regarding Intellectual Property

Plaintiffs argue that the UPR intellectual property policy determines ownership of the proposal even if it is a work for hire. Initial authorship of a work for hire may only be changed by an express written agreement signed by both parties. 17 U.S.C. § 201(b); Saenger, 113 F.3d at 63. Thus, courts have found that universities' institutional policies, absent such formalities, do not alter the ownership of works made for hire. See 1-5 Nimmer § 5.03 (citing Manning v. Bd. of Tr. of Cmty. Coll. Dist. No. 505 (Parkland Coll.), 109 F. Supp. 2d 976, 981 (C.D. Ill. 2000), Rouse, 513 F. Supp. 2d at 1063–64, and Foraste v. Brown Univ., 248 F. Supp. 2d 71, 80–81 (D.R.I. 2003)); Howard B. Abrams, Law of Copyright § 4:26 n. 1 (West 2011) (citing *Foraste*). In Rouse, after finding no genuine dispute that the plaintiffs were university employees who created a work for hire, the court found there was no evidence of a signed express agreement allowing them to retain

---

permit an inference of any particular exclusive motivation for the work. (See Docket No. 363-2, p. 2–3).

authorship. 513 F. Supp. 2d at 1065. Although the university policies contained provisions regarding the ownership of intellectual property rights, the court found that plaintiffs "failed to produce a written agreement between themselves and [the university] that expressly states on its face that [the plaintiffs] would have claim to a copyright to [the work], to the exclusion of [the university]." Id. at 1064. The court in Foraste similarly granted summary judgment where the university policy at issue was plainly not "an express agreement . . . signed by both Foraste and Brown." 248 F.Supp. at 81. And the Manning court rejected a theory that the university policy created an implied contract to alter work for hire because "[a]n agreement altering the statutory presumption under the Copyright Act must be *express*." 109 F. Supp. 2d at 981 (emphasis in original).

Nevertheless, plaintiffs assert that "this court has already determined that the facts of the instant case must be analyzed under the UPR's Institutional Policy Regarding Intellectual Property . . . which expressly moderates the work for hire doctrine applicable to the instant case." (Docket No. 362, p. 14). This overstates the prior ruling. After finding that the historic "teacher exception" to the work for hire doctrine was no longer good law, the court only ruled that "Plaintiffs may claim no such exception in relation to Defendants' work for hire defense." Molinelli-Freytes v. Univ. of P.R. (*Exception Ruling*), 792 F. Supp. 2d at 172. Though the court stated that it would *consider* relevant UPR regulations, it expressly reserved the question of whether the Proposal was a work for hire. Id. at 166 n. 1. It is therefore necessary to consider whether relevant policies may alter the § 201(b) classification of ownership.

Here, there is no evidence of any signed agreement between plaintiffs and UPR, and plaintiffs point to no evidence from which a jury could infer the existence of such a signed written instrument. Therefore, even crediting the plaintiffs' interpretation of UPR policy, a jury may not conclude that Molinelli or Bird were the proposal's authors under the Copyright Act. "In essence, [section 201(b) is a statute of frauds." Baltimore Orioles, Inc. v. Major League Baseball Players Assoc., 805 F.2d 663, 672 (7th Cir. 1986). Even if, as plaintiffs argue, "the UPR further [led] their faculty to trust that

they own the copyrights to their academic work regardless of scope of employment" (Docket No. 362, p. 17), the plain language of the statute controls.

Plaintiffs "turn the attention of the Court" to three cases: <u>Weinstein v. University of Illinois</u>, 811 F.2d 1091 (7th Cir. 1987), <u>Hays v. Sony Corp. of Am.</u>, 847 F.2d 412 (7th Cir. 1988), and <u>Pavlica v. Behr</u>, 397 F. Supp. 2d 519 (S.D.N.Y. 2005). (Docket No. 362, p. 15). <u>Hays</u> and <u>Pavlica</u> are completely inapposite. After explaining the "teacher exception" in dicta, <u>Hays</u> merely rejected the lower court's inference that the work at issue was made within the scope of employment. 847 F.2d at 416–17. <u>Pavlica</u>, citing *Hays*, also found a genuine issue of fact regarding the scope of employment. 395 F. Supp. 2d at 525–26. Neither establish any rule regarding "the interpretation of work for hire doctrine within an academic setting," and plaintiffs offer no analysis as to how they could be read to influence the outcome here. Without more substantive argument, plaintiffs' skeletal invitation to follow these cases merits no further consideration. <u>United States v. Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990).

Plaintiffs go only slightly further in their reference to <u>Weinstein</u>, pointing out that the court relied on a construction of a university's policy in determining the ownership of intellectual property created by a professor. (Docket No. 362, p. 15). In the district court below, Professor Weinstein alleged that the University of Illinois deprived him of due process by appropriating data and a report he prepared regarding a continuing education program, stating "that the initial idea to institute the program was his, that he was primarily responsible for collecting data emanating from the program, and that [he] was to write a scholarly paper concerning the program and submit it for publication . . . ." <u>Weinstein v. Univ. of Ill.</u>, 628 F. Supp. 862, 863 (N.D. Ill. 1986). The district court looked to the University's institutional regulations and found that the data and report fell within a category of works in which the University would hold the copyright, leaving him with no due process claim. <u>Id.</u> at 865. However, the opinion did not construe or apply the Copyright Act in reaching this decision. <u>See id.</u> On appeal, the Seventh Circuit briefly noted that "[t]he copyright law gives an employer the full rights in an employee's 'work for hire,' . . . unless a contract provides otherwise."

Weinstein, 811 F.2d at 1093–94.  The court then accepted, without further analysis of section 201, that the University's policy altered the work for hire rule, and rejected the district court's interpretation of the policy in light of "the academic tradition since copyright law began" of vesting copyright in scholars.  See id. at 1094.  But *Weinstein* is unpersuasive here because it neither offers nor relies upon any principle guiding the application of § 201.  In other words, regardless of the value in *Weinstein*'s normative analysis of academic copyright ownership, its considerations come at a later stage of analysis than the plaintiffs have reached here.  Without overcoming the threshold matter of the IP policy's applicability, there is no occasion to consider how it should be construed.

Thus, the defendants have demonstrated a lack of evidence that the UPR IP policy alters work for hire under 17 U.S.C. § 201, and plaintiffs have not met their burden of showing a triable issue of fact on this question.  Because the defendants have shown that the proposal comes under the work for hire rule, they are entitled to judgment.  However, I pause to consider one additional challenge raised by the plaintiffs.

### D.      Standing to Challenge Plaintiff's Authorship Claim

Plaintiffs assert in passing that the "individual defendants do not have standing to question their *prima facie* case of ownership" because they do not claim authorship of the proposal.  (Docket No. 362, p. 13 n. 14).  However, they provide "neither the necessary caselaw nor reasoned analysis to show that [they are] right about any of this." Velásquez Rodríguez, 659 F.3d at 176.  Therefore, I am persuaded by the UPR defendants' argument that the plaintiffs have the burden of proving ownership, and the defendants are free to demonstrate a defect in that ownership to avoid liability.  (Docket No. 391, p. 7).  But because the authorship challenge disposes of plaintiffs' copyright claims, it is worthwhile to review whether their "standing" contention has any merit.

The principle that non-author defendants may not always challenge a plaintiff's claim of ownership is most clearly expressed in cases challenging the technical validity of an assignment.  The Copyright Act requires assignments of ownership to be made in a signed writing in order to be valid.  17 U.S.C. § 204(a).  The leading case,  Eden Toys, Inc. v. Florelee Undergarment Co., 697

F.2d 27, 36 (2d Cir. 1982), reasoned that the purpose of § 204(a) "is to protect copyright holders from persons mistakenly or fraudulently claiming oral licenses." The court held that a writing executed after an oral assignment satisfied § 204, but went on to comment that "[i]n this case, in which the copyright holder appears to have no dispute with its licensee on this matter, it would be anomalous to permit a third party infringer to invoke this provision against the licensee." Id.. Other circuits followed *Eden Toys*, both in concluding that later-made writings were valid and in observing that § 204 should not protect third-party infringers. See Magnuson v. Video Yesteryear, 85 F.3d 1424, 1428–29 (9th Cir. 1996); Imperial Residential Design, Inc. v. Palms Devel. Group, Inc., 70 F.3d 96, 99 (11th Cir. 1995). Most recently, the Third Circuit reviewed the *Eden Toys* line and held that absent a transferor-transferee dispute, "a third-party infringer in such a case cannot evade liability by invoking § 204(a) and demanding a contemporaneously-drafted instrument." Barefoot Architect, Inc. v. Bunge, 632 F.3d 822, 830 (3d Cir. 2011).

Yet outside of section 204, "[t]he law is not settled regarding whether a third party non-author . . . can challenge the validity of an alleged owner's copyright." Dataworks, LLC v. Commlog, LLC, Civil No. 09-CV-00528-WJM-BNB, 2011 WL 2714087, at *3 (D. Colo. July 13, 2011). *Dataworks* highlights two recent views on this question. On the one hand, a district court opinion in this circuit cites *Imperial Residential* to reject a third party's challenge to a *prima facie* presumption of authorship. See Homeowner Options for Mass. Elders, Inc. v. Brookline Bnacorp, Inc., 789 F. Supp. 2d 242, 243–44 (D. Mass. 2011). On the other hand, while "[t]here may be some doubt, as a policy matter, about the wisdom of permitting a non-author to challenge the copyright holder's right to enforce its copyright. . . . the case law does appear to recognize an alleged infringer's right to mount such a challenge." Int'l Code Council, Inc. v. Nat'l Fire Prot. Ass'n, Inc., No. 02-C-5610, 2006 WL 850879, at *18 n. 33 (N.D. Ill. Mar. 27, 2006) (citing M.G.B. Homes, Inc. v. Ameron Homes, Inc., 903 F.2d 1486, 1490 (11th Cir. 1990) and In re Napster, Inc. Copyright Litig., 191 F. Supp. 2d 1087, 1097 (N.D. Cal. 2002)).

But regardless of whether the *Eden Toys* rule is generally applicable to other types of authorship defenses, it is wholly inapposite here. This is not a case where the defendants "knew or should have known that they were at least potentially infringing *someone's* copyright—even if they perhaps could not be precisely sure whose." See Barefoot Architect, 632 F.3d at 830 (emphasis in original). Rather, the central matter in this case is whether UPR had the right to make and disseminate derivatives of the original proposal. Thus, allowing the individual defendants to challenge ownership would not "permit a third-party infringer to invoke [a writing requirement] to avoid suit," id., but rather, is dispositive of whether they are infringers at all. There is simply no basis whatsoever for an infringement suit if UPR owns the copyright. Moreover, plaintiffs pleaded claims against UPR that were only dismissed because of its sovereign immunity (Docket No. 151), so it cannot be fairly said that "the copyright holder appears to have no dispute with" the plaintiffs. See Eden Toys, 697 F.2d at 36. In sum, regardless of whether the law should generally disfavor a non-author's challenge under the Copyright Act writing requirements, this particular case would fall outside that rule.

Because the plaintiffs have not set forth any substantial argument for why the defendants should not be allowed to challenge their authorship, and because no such general rule would apply even if it exists, defendants are entitled to summary judgment.

## VI. Plaintiffs' Requests for Relief under the Copyright Act

Plaintiffs variously reiterate requests for damages, declaratory relief, and injunctive relief on their copyright claims. (Docket No. 362, p. 1–3, 30–35). Because the defendants have shown they are entitled to summary judgment on infringement liability, there is no basis for granting plaintiffs any of their requested relief under the Copyright Act.

## CONCLUSION

For the foregoing reasons, I recommend that the plaintiffs' motion to renew their due process claims be **DENIED**. I further recommend that the defendants' motions for summary judgment be

**GRANTED**, that plaintiffs' requests for relief be **DENIED**, and that plaintiffs' claims under the Copyright Act be **DISMISSED WITH PREJUDICE**.

This report and recommendation is filed pursuant to 28 U.S.C. 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. **By prior order of the court, any objections to the same must be specific and must be filed with the Clerk of Court within <u>FIVE (5) BUSINESS DAYS</u> of its receipt.** (Docket No. 343). Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review. See <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985); <u>Davet v. Maccorone</u>, 973 F.2d 22, 30-31 (1st Cir. 1992); <u>Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.</u>, 840 F.2d 985 (1st Cir. 1988); <u>Borden v. Sec'y of Health & Human Servs.</u>, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED.**

In San Juan, Puerto Rico, this 15th day of February, 2012.


*S/Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge